2022 IL App (1st) 210191-U

SECOND DIVISION
June 28, 2022

No. 1-21-0191

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Respondent-Appellee, | ) ) | |
| v. | ) ) | No. 16 CR 7306 |
| DECAREE MITCHELL, | ) ) | |
| | ) | Honorable Thomas J. Byrne, |
| Petitioner-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin in the judgment.

ORDER

¶ 1    *Held*: We affirm the trial court's order dismissing defendant's postconviction petition. Defendant was not prejudiced by his trial counsel's failure investigate whether fingerprints were present on cartridge cases found at the shooting scene; defendant's trial counsel was not ineffective when he did not object to an alleged hearsay statement because the statement was not hearsay.

¶ 2    Defendant Decaree Mitchell was convicted by a jury of attempted first-degree murder in the shooting of Londrell Thomas. We affirmed his conviction on direct appeal. *People v. Mitchell*, 2019 IL App (1st) 172261-U, ¶ 57. Defendant filed a postconviction petition alleging that his trial counsel was constitutionally ineffective for failure to investigate whether

fingerprints were present on cartridge cases found at the scene of the shooting, and that his trial and appellate counsel were ineffective for not challenging the admission of an alleged hearsay statement. The circuit court dismissed defendant's postconviction petition at the first stage. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4       Defendant was convicted of attempted first-degree murder for shooting Londrell Thomas.[1] Thomas testified at trial that he traveled to the 6200 block of South Marshfield Avenue in Chicago with his cousin and his nephew. They went to that location to pick up a vehicle from a mechanic, Danny Curtis, who worked out of his home and to check on Thomas's grandmother's house who lived on the same block. Thomas parked on the street in front of Curtis's home and went to Curtis's backyard to check on the status of the vehicle being repaired. Thomas's cousin and nephew went to the grandmother's house.

¶ 5       As Thomas walked through a gangway to the back of Curtis's home, he walked past defendant Decaree Mitchell, whom he knew as "Car-Car." Thomas and defendant had "bad blood" from previous incidents. Thomas had known defendant for about 20 years. They had various family connections, including that Thomas at one point dated defendant's sister. Thomas testified that defendant and his friends shot out the windows of his car 10 years earlier. A year before encountering defendant outside Curtis's house, defendant and two other men, including a man named "Law," approached Thomas in a bar. Defendant said to Thomas at the bar "If I wanted to get you, I could have got you." After Thomas checked on his vehicle in the back of the mechanic's house, he went back out to the front of Curtis's home towards where he had parked.

_____

[1] The facts supporting defendant's conviction are more fully set forth in our order affirming his conviction on direct appeal. See *People v. Mitchell*, 2019 IL App (1st) 172261-U.

Defendant was standing next to Thomas's car on the driver's side and "Law" was standing near the vehicle on the passenger's side.

¶ 6    Thomas approached his car and grabbed the door handle. At that time, defendant said "I've got you now, motherfucker" as he pulled out a handgun and shot Thomas in the leg. After the first shot, the gun jammed. Defendant unjammed the gun and shot Thomas in the leg again. Thomas fled towards his grandmother's house as Law said to Thomas "run now you bitch ass n***, run now you bitch ass n***." Thomas continued to run towards his grandmother's house, but defendant continued to pursue him and ran up close on him. The gun jammed again. Defendant was able to unjam the gun once more and he shot Thomas from close range two more times in his side and in his arm. Defendant then took off running.

¶ 7    Thomas told the responding officers that "Car-Car" shot him. Thomas testified that he had no obstructions viewing defendant and had no problem seeing that it was defendant that shot him. Thomas identified defendant and Law in photographs for detectives and he identified defendant in court as the person who shot him.

¶ 8    Thomas's nephew, Kevonte Thomas, similarly testified that "Car-Car" shot Thomas, and he identified defendant in open court as the person he knew as Car-Car. Kevonte testified he was just a few feet away from the shooting when it occurred. Kevonte had known defendant his whole life. Kevonte also testified that Law was present at the shooting. Danny Curtis, the mechanic, testified that he heard the gunshots and came to the front of his house. Curtis saw that Thomas had been shot, and Curtis testified that Thomas told him right after the shooting that Car-Car shot him. Defendant's mother acknowledged at trial that his nickname is Car-Car.

¶ 9    Detective Peter Muhney testified that he investigated Thomas's shooting. Officers secured an arrest warrant for defendant, and he was arrested in Madisonville, Kentucky and

brought back to Chicago. During cross-examination, defense counsel asked Muhney if the shell casings found at the scene of the shooting were "dusted" for fingerprints.

"[Defense Counsel]: You could have sent somebody to the evidence and recovery section of the police department to pick up those shell casings, have them inspected for latent fingerprints. Could you have done that?

[Detective Muhney]: Those were sent to the crime lab. That's done by the evidence technicians.

[Defense Counsel]: So that was done routinely?

[Detective Muhney]: I think that's a question for the evidence technicians. That's what they do.

[Defense Counsel]: What about a question for the person that's handling this investigation? Did you follow up and see if there was latent fingerprints recovered from those shell casings?

[Detective Muhney]: There were no prints recovered.

[Defense Counsel]: Was it at least dusted by the fingerprint section?

[Detective Muhney]: I don't know the procedures that they use. I don't know if they use dust or any new types of procedure. I'm not qualified to answer.

[Defense Counsel]: I know you don't know the procedures, but did you check with the fingerprint section of the police department to find out if fingerprints could have been lifted from those pieces of evidence?

[Detective Muhney]: I believe I asked if there were -- answered that there were no prints recovered from the shell casings.

[Defense Counsel]: Who told you that?

[Detective Muhney]: We get lab reports.

[Defense Counsel]: Did you bring those with you to court?

[Detective Muhney]: I'm sure they're in the file."

¶ 10    Three months after Thomas was shot, Law was shot and killed. "Law" was Marlon O'Banner. Officers responding to the scene of O'Banner's death recovered a 9-millimeter semiautomatic handgun from his waistband. A firearms expert concluded that the shell casings recovered in Thomas's shooting were from ammunition fired from the weapon found on O'Banner's body.

¶ 11    Defendant presented an alibi defense at trial. He presented testimony from his stepbrother, his girlfriend, and his mother that he was in Kentucky at the time Thomas was shot. During closing argument, defense counsel discussed the issue of potential fingerprints on the shell casings. Defense counsel told the jury that no one had come to court to testify that they checked the casings for fingerprints and that there were no fingerprints. Defense counsel argued that Detective Muhney's statement that there was an unidentified lab report showing no fingerprints on the shell casings was "a lie."

¶ 12    The jury rejected defendant's asserted alibi defense and found him guilty of attempted first-degree murder. The jury also found that defendant personally discharged a firearm during the commission of the offense. The trial court sentenced defendant to 31 years in prison.

¶ 13    Defendant filed a direct appeal arguing that there was insufficient evidence to support his conviction. We rejected defendant's arguments, finding that the State presented sufficient evidence to prove defendant guilty of attempt first-degree murder beyond a reasonable doubt in light of the strong and consistent identification of the defendant as the shooter by the victim and

other witnesses who had known defendant for years. *Mitchell*, 2019 IL App (1st) 172261-U, ¶ 55.

¶ 14    After we affirmed defendant's conviction, he filed a *pro se* postconviction petition in the circuit court. In his postconviction petition, among other things, defendant argues that his trial counsel was ineffective for failing to investigate whether the shell casings recovered in this case contained any fingerprints. Defendant also argues that his trial counsel was ineffective for failing to object to the introduction of O'Banner's statement in which O'Banner told Thomas to run after he was shot. Defendant argues that his counsel on appeal was ineffective for failing to raise the issue of the admission of O'Banner's statement in his direct appeal. The circuit court dismissed defendant's postconviction petition at the first stage. Defendant now appeals the first-stage dismissal of his postconviction petition.

¶ 15                                    ANALYSIS

¶ 16    Defendant argues that the circuit court erred when it dismissed his postconviction petition at the first stage. The Post–Conviction Hearing Act provides a method by which defendants may assert that, in the proceedings that resulted in their convictions, there was a substantial denial of their federal or state constitutional rights. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The Act provides for a three-stage process for adjudicating postconviction petitions. *People v. Harris*, 224 Ill. 2d 115, 125 (2007). At the first stage, the circuit court independently assesses the merit of the petition and may dismiss the petition if it is frivolous or patently without merit. 725 ILCS 5/122–2.1 (West 2018); *People v. Smith*, 2021 IL App (1st) 181728, ¶ 17.

¶ 17    In this appeal, defendant argues his claims of ineffective assistance of counsel should have survived first-stage postconviction scrutiny. First, defendant argues that his trial counsel was ineffective for failing to investigate whether fingerprints could have been recovered from the

shell casings discovered at the scene. Second, defendant argues that his trial counsel was ineffective for failing to object to the out-of-court statement by Marlon O'Banner in which he urged Thomas to run after he was shot, and that his appellate counsel was ineffective for failure to raise the issue in his direct appeal.

¶ 18    The United States Constitution guarantees criminal defendants the right to effective assistance of counsel. U.S. Const. Amend. VI (West 2020). Thus, where a criminal defendant is convicted of an offense but did not receive constitutionally adequate representation, he can seek relief to vindicate his constitutional right to counsel. *People v. Burnett*, 385 Ill. App. 3d 610, 614 (2008). To prove that he was denied the effective assistance of counsel guaranteed by the Sixth Amendment, a petitioner must show (1) that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed [petitioner] by the Sixth Amendment," and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691 (citing *United States v. Morrison*, 449 U.S. 361, 364–65 (1981)). "Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692. We analyze claims of ineffective assistance of counsel by considering the entire record. *People v. Hommerson*, 399 Ill. App. 3d 405, 415 (2010).

¶ 19                    Fingerprints on Cartridge Cases

¶ 20    Defendant argues that his trial counsel should have investigated the shell casings to determine if there were fingerprints on the casings that belonged to someone other than him. Defendant contends that because the weapon used in this case was later found on O'Banner, who

was at the scene when Thomas was shot, fingerprints on the shell casings from someone other than defendant would have been exculpatory. Defendant points out that the record demonstrates either that the shell casings were never tested for fingerprints or that defense counsel was unaware of the results of the testing at the time of trial. Defendant concludes that his trial counsel was ineffective for failing to investigate and present the potentially exculpatory evidence. Defendant maintains that it is at least arguable that his defense counsel failed to explore a readily available defense that would have benefitted him at trial.

¶ 21    Although defendant argues his attorney failed to uncover potentially exculpatory evidence, this is not the standard used by courts to evaluate an ineffective assistance claim. To prove a claim of ineffective assistance, a petitioner is required to demonstrate with a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687. When considering an ineffective assistance of counsel claim, the United States Supreme Court has held that a reviewing court may first consider whether defendant suffered prejudice as a result of an alleged error before evaluating counsel's performance. "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697.

¶ 22    Following the guidance from the United States Supreme Court, we will first determine whether defendant was prejudiced by counsel's alleged failure to investigate fingerprints on the shell casings to evaluate his ineffective assistance claim.

¶ 23    The testimony at trial showed Thomas and his nephew knew defendant by the nickname Car-Car many years before the shooting. At the scene of the shooting, Thomas told responding officers Car-Car was the person who shot him. When Thomas was interviewed by detectives in the hospital, he told them he knew the person who shot him was nicknamed Car-Car. Thomas did not know defendant's legal name. After eventually learning Car-Car's legal name, the victim notified police which led to the arrest of defendant.

¶ 24    The victim's nephew witnessed the shooting in broad daylight and he knew Car-Car as well. The nephew's testimony demonstrated that defendant was present at the scene, armed with a firearm, and that he shot Thomas four times from close range. Nothing was presented at trial that cast any doubt on the strong and convincing eyewitness testimony. Thomas and his nephew had both known defendant for many years and confidently expressed that he was the shooter from the time that the shooting happened through the time of trial. While Thomas and his nephew both testified that "Law," Marlon O'Banner, was present, they both testified that he was unarmed and that his actions were limited to being present and telling Thomas to run after defendant shot him.

¶ 25    In this case we conclude defendant's claim of ineffective assistance fails. The eyewitness testimony in the case was strong. We recounted the testimony at length and discussed its strength and consistency when we affirmed defendant's conviction over his challenge to the sufficiency of the evidence. See *Mitchell*, 2019 IL App (1st) 172261-U, ¶¶ 45-55. Even if the cartridge casings contained fingerprints from Law or someone other than defendant, it would have had no effect on the outcome of the trial. Therefore, defendant's claim of ineffective assistance, based on the alleged failure to investigate fingerprints on the cartridge cases, fails.

¶ 26                          Alleged Hearsay Statement

¶ 27    The second basis on which defendant claims his counsel was ineffective was his counsel's failure to object to the introduction of O'Banner's out-of-court statement. Thomas testified that after defendant shot him in the leg, O'Banner said "run now you bitch ass n\*\*\*, run now you bitch ass n\*\*\*." Defendant did not raise this issue on direct appeal. The State argues defendant has forfeited this issue by failing to argue ineffective assistance in his direct appeal.

¶ 28    A postconviction proceeding allows inquiry only into constitutional issues that were not and could not have been adjudicated on direct appeal. *People v. Williams*, 394 Ill. App. 3d 236, 242 (2009). Any issues that could have been raised on direct appeal, but were not, are forfeited. *People v. Jefferson*, 345 Ill. App. 3d 60, 70-71 (2003). The facts to support petitioner's current ineffective assistance of trial counsel claim based on O'Banner's statement were easily ascertainable from the record on appeal. Defendant's claim that trial counsel was ineffective for failing to raise a hearsay objection to O'Banner's statement is forfeited because it could have been raised on direct appeal.

¶ 29    Although the claim is forfeited in terms of trial counsel's alleged error because it was not raised on direct appeal, defendant argues that he should be allowed to pursue the claim because his appellate counsel was ineffective for failing to raise the issue on appeal. Forfeiture aside, O'Banner's statement was not hearsay.

¶ 30    We agree with the determination that the trial court made before trial and that the postconviction court made when dismissing defendant's petition: the statement was not hearsay. O'Banner's statement was not the assertion of a fact, it was a command to Thomas urging him to run after he was shot. "Commands are generally not hearsay, because the significance is the command itself and there is no truth being asserted in a command." *People v. Price*, 2021 IL App (4th) 190043, ¶ 139 (quoting *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 81). The

statement was also admissible through Thomas for the effect that the statement had on him. See

*People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008) (an out-of-court statement offered to prove

its effect on a listener's mind or to show why the listener subsequently acted as he did is not

hearsay and is admissible).

¶ 31    Had trial counsel made an objection to the testimony about the comment as hearsay, the

objection would have been subject to proper overruling. Had appellate counsel raised the issue

on direct appeal, the claim would have been subject to proper rejection. The claim lacks an

arguable basis in law because counsel's performance was not deficient with respect to the

statement. See *Hodges*, 234 Ill. 2d at 16-17 (a postconviction claim based on a meritless legal

theory is subject to dismissal). Therefore, the circuit court did not err when it dismissed

defendant's postconviction petition at the first stage.

¶ 32                                   CONCLUSION

¶ 33    Based on the foregoing, we affirm.

¶ 34    Affirmed.